appointed under the Criminal Justice Act, and likewise, we appreciate your service. That's correct, your honor. May it please the court, my name is Robbie Golden. And you don't need to wear your mask. My name is Robbie Golden, and I represent Devion Cumbie. And as the court's noted, I was appointed to represent Mr. Cumbie through the CJA panel. On behalf of Mr. Cumbie, I present three points on appeal for the court's consideration. The first point is that during jury selection, the government used three of its strikes against black jurors based on their race. The second point is that Mr. Cumbie was denied the right to cross-examine Mr. Primo about some text messages and some statements that he had made, and also impeach him with inconsistent statements. The third point on appeal, your honor, is that a juror had, I believe I phrased it as misconduct, but a juror had reported to the court's juror administrator that she had some concerns, and I argued to the court that she had formed an opinion prior to deliberations with her fellow panel members. I'd like to start with the Batson issue first. Periphery challenges have historically been, obviously, used for any purpose. That purpose could be based on race, based on eye color, whatever that was, and when squarely addressed with the fact that, you know, periphery challenges based on race, the Swain court decided no, that's okay. Do you agree that we're only talking about the perimetries even though they're the brief reference to cause challenge? I didn't raise the cause challenge as a separate issue, but I do believe it's relevant in the sense of the numbers. Okay, all right. But yes, your honor, I did not raise that as a separate issue. Maybe you should have. Well, no, I think the case law says it's not part of the Batson constitutional landscape. Again, your honor, it's just kind of the circumstances of the case with regard to the strikes that could follow. You can challenge a district court's decision to sustain a forecaused, but it's a different argument. And I'm not making that argument. Okay. So, as the court's well aware, this is an area of the law where I don't believe either party's disputing what the law is here. The law's been fashioned since Swain, you know, saying that it was okay, citing Cook and Blackstone, that the nature of peripheries are that we can use them for any reason. Obviously, things have changed. 20 years later, Batson decides that a periphery challenge based solely on race is unconstitutional. And the crux of the issue, the thrust of what the court is left with now, is we have an idea of what the law is and we have a process in trying to ferret out what is a racist strike, or not racist, I shouldn't say that, but a strike based on race. When is that occurring? And the court has to make a very factual determination as to when that's happening, because you have one side alleging it and you have another party saying, no, I didn't do that. And the district court here followed the right process, right? The real question is, is you're saying the district court followed the right process, but reached the wrong conclusion on some of these jurors. That's right. I believe Judge Moody protected me in the sense of his ruling, because I hadn't, we hadn't gone through the three-step process. And we kind of were muddying the waters and not doing it very clearly. But in his ruling, he does make it clear that I'm making a factual finding that these race-neutral reasons are not protectual. That was his finding. Well, to jump with the question that I want to ask here is, what is your best Eighth Circuit case where a Batson challenge was upheld because the government applied a non-discriminatory reason differently with respect to white jurors, what you might call protectual non-discriminatory reason? I was not able to cite the best case for that. I was able to distinguish the Jones case, which was, I think, a 2020 case. Yeah, but I want a positive one. We can, we spend our, we started first year in law school, we spend our careers distinguishing bad things. And sometimes as a defense lawyer, that's what I'm left with, I understand. I just want, have you got, and all right, outside the Eighth Circuit, did you find one where the government was giving a perfectly good reason the district judge upheld, then got reversed because it was protectual or remanded? Maybe the Miller L. Dretke case that I cited, maybe that, your honor. Miller L. Dretke, I believe, is the U.S. Supreme Court case. The Flowers case is a very, it's a very famous case, but I don't think it applies apples to apples in this situation, but obviously the Supreme Court overruled that case. On Miller L., that was actually the year I clerked, but I can't remember the circumstance. Wasn't there a smoking gun in that case, as I recall, that said that the attorney's office or the DA's office had a history of making race-based strikes? If you're not familiar with it, that's fine. But if that's true, that would distinguish this case. We don't have any kind of history of that here. I'm sorry, your honor, I don't, I know there were several, the Swain case, the old case, there was a history of Dallas doing that, or Alabama, but there was another case where the Dallas attorney's office had done that, and I'm not sure. Yeah, and I might be misremembering. We had a couple of bats in case I hear. I apologize. I'm not more informed on that. Well, you don't have to have a good case. I just, you know, it's obviously, it's helpful, but we accept invitations to break new trails all the time. I don't believe we're breaking new trails, your honor. I believe based on the circumstances of this case, and when you take the entire, starting with the first trial that ended in a mistrial, and then you take that in conjunction with the protest, and then race was weighing heavy on this case, and so I think when you take that as a whole, and in my brief that I argue, and still contend, that the four out of the first 14 jurors were black, and we lost all four of those, and three out of the six strikes were against black people, your honor, and in my brief, I argue, I think probably more artfully there than I'm doing right now, that the questions asked, the fact that similarly situated white people were left on the jury, that answered questions in the way that they, that answered questions that they use as their race-neutral reasons to strike the black jurors, and I just, that based on my review of the case law, and the progeny since Batson and Swain, is the court's left with a very fact-intensive decision, and it's difficult for a circuit court, but I believe in my brief, in my argument, that based on what's happened in this case, and the circumstances surrounding, that those reasons were pretextual, and that the basis of the strikes were motivated in substantial part by race, and obviously, I know the court can disagree with me, but that is my point. Well, I want to make sure we have time on the text message thing is a really tough issue, and I want to, you know, I want to ask you a couple, a couple of questions about it. The first of which is, doesn't it need to be authenticated by someone before it gets into court, so that somebody says this is actually a genuine text message? Well, I think it probably, it was, I would contend, but I don't think it's a requirement under, under 607 or 613. Well, let me, let me give you a hypothetical. I realize this isn't, isn't what happened in this case, but suppose walking into the courtroom for trial, you find a note that says, I did it by some third party, and then it's signed some third party, and then that, that particular witness is getting up on the stand, that third party, and you're like, look, I found this note outside the courthouse this, or outside the courtroom this morning, and you try to use it as a prior inconsistency. Isn't that a problem? I think it's a big problem, but I think it's very distinct from what happened here. Yeah, but there's, there's allegations that these were falsified. There's nobody who comes in and says this was, this was necessarily a genuine text message. All you have is, I didn't send it by the Cervantes Combi testified that I received these messages from Mr. Primo. Mr. Primo admitted that that's my phone number that sent those messages. He accepted every one of those messages, bam, bam, bam, bam, all the way through, except for one little bubble, you know, one little text message. I, I, I do not believe it's in contention that that was his phone or that it was sent from his phone. The only thing that's in contention is that he denies sending it, and I think with any inconsistent statement, that's, everyone denies. She, she testified that she did receive that one? Yes. From? In a proffer, from his phone. In a, in a, we, yes, Mr. Cervantes never testified at trial, Your Honor. I didn't think so. There was a proffer at the first trial. Well, what was, yeah, typically in a proffer, the potential witness is there. He was. And proffered, she, I mean. Both. Both, if I may, Your Honor. She proffered under, under oath? Yes. Well, what happened was the court, the district court made a ruling that I was not going to be allowed to ask Mr. Primo about this issue. And so, when we got, when the state rested their case at the first trial, we went in and I asked the judge to, to proffer both Mr. Primo's testimony and Mr. Cervantes. And so, they both testified in the first trial, Your Honor, and that record was, should be, it was adopted by the, the district court. And then when he made his rulings, he just said, I'm keeping them the same. But, but what I did is Mr. Primo testified. She test, she testified in one trial or? Never, she never testified in front of a jury. All right. She testified in front of the district court. Primo testified before the jury in both cases. Correct. Both trials. Correct. He was called as my witness in the first case and as the government's witness in the second case. And did he, so the proffer was testimonial? Yes. She was sworn in. And they both, they both testified, no, well, he didn't, he denied it in the proffer? He denied it at, in front of the jury and in the proffer, sending that one text message out behind it. Yeah, the only one that mattered. Well, and didn't he also testify that it was deleted too from his phone? Like, he never saw the message on his phone. Yes. I'm gonna confuse that with the fact that he deleted every message before the FBI interviewed him. And I don't, I don't recall. I know he said, I didn't discover that until today or something like that because it wasn't what he, it was deleted from my phone. So there's something about that. I can ask the government about it as well. When he was interviewed by the FBI, he had deleted every message from his phone with regard to that. And I, that may be, I just can't remember if he testified that that message had been deleted specifically. I don't recall. Your Honor, I'm into my rebuttal time. If the court has more questions, I'm happy to answer them. If not, I'll cede to Ms. Bryan. Well, I did. So at the second trial, there was, was there any, was there anything, did Defense Counsel do anything when Primo was on the stand at the second trial to renew this issue? Yes. Before he testified, I approached the bench to make sure. But, but, all right. And so then you, you questioned him, but, all right, if you, I don't mean you tried it necessarily. I did. Yeah. But you stayed away and, and so you, all right, it's, it, it, you couldn't, the, the reason that you, you, you wanted to, you wanted to use it to impeach the witness that you wanted the jury to believe was the bad guy instead of the defendant. I wanted to be. So it was, it was indirect. And the jury, the jury could not have, could not have accepted that impeachment without a finding that he actually sent it. Right? I, no, I, I don't, I guess that's where I, I don't agree with the court. The testimony would have been conflicting. Ms. Cervantes. Yeah, but, all right, so you, so you've impeached Primo, who you want the jury to believe was the real bad guy. Correct. All right. It doesn't, it doesn't bear directly on what, what the defendant did. No. In that sense, it's collateral. And your objective was to establish that he sent something that he denied sending. So it seems to me, and leaving aside the 613 and all these other contexts, this is a classic case of the district court saying we're not going to have a mini trial on a collateral matter. A disgraced court. I mean, the, the, Mr. Primo denies using the phone and sending these messages. The district court said this will be confusing to the jury. That's classic. We're not going to go there because it would require a mini trial and distract and confuse the jury. That's, that's, that's reasoning that happens all the time. The district court said he found it to be unreliable and hearsay with no exception. And confusing. I don't recall him making that ruling. They argued that, but he. I read the, it's in there. He said it's confusing. It would, that was part of the explanation. Um, which was cryptic for sure. But, but how could the jury would have to find, would have to. Well, first of all, someone would have to call Mrs. Cumbie. There would have to be something refuting Primo's testimony. I didn't send that. In order for the jury to find that he did send it. So then it could be used for the limited purpose that it was admissible, potentially admissible under 613 for. It would have merely been permissible to him as impeachment evidence. And I would have called. But you're not impeaching the defendant. You're impeaching, you're impeaching a, you're impeaching a defense witness who's only a defense witness. So you can lay a foundation for blaming, blaming it on him. Well, he was a government witness in the second trial, pardon? He was a government witness in the second trial. Okay. He was your witness in the first trial. Yes. And they called him in the second trial. And I did ask the court to reconsider based on him being a government witness now. I asked the district court that. And you, and you still have the, you still have the reliability problem. You still have, you still have impeaching him for something he says he didn't do. In every impeachment, someone says they didn't say that generally. Can I ask one follow-up question on this? So Judge Loken mentioned 403, and this is on page 446 of the transcript. And I, this was the only time I saw the word confusing. I, the prosecutor said, and then I think we run into a 403 argument about that it's going to be confusing to the jury to say, well, did you receive this text message? No, I didn't receive this text message. And then confusion is again in the next paragraph, but I didn't see the district court address the confusion. Did you recall that? I'm going to ask the government the same thing. I do not. And that's truly the crux of the issue. Text 446. I think we run into a 403 argument about that. It's going to be confusing to the jury to say, well, did you receive this message? No, I didn't receive this message. That's Ms. Bryant's words, Your Honor. Pardon? That's Ms. Bryant's words. Yeah, that's the, I think it's the prosecutor. Could I address just briefly what you were at? I mean, that's the issue, I believe, with the Buffalo case is whether or not he made a 403 finding. And he did not is my position. They made a brief mention of this, but Judge Moody consistently harkened back to his original rulings, which were based on hearsay. Okay. I'm completely out of time, but I'm happy to field any further questions the court may have.  Ms. Bryant? May it please the court, my name is Kristen Bryant, and I represent the United States in this matter. And in leaving off where the court was questioning Mr. Golden, and just to answer Strass' question, on page 435 of the transcript, Mr. Primo did testify that he never saw the text message that, what I would call the fabricated text message, he testified that he never saw that. And then when the FBI agents approached him, he did not have any of the text messages because he said that he had deleted all of the messages between him and Ms. Cumby. As Mr. Golden stated, we did argue that, one, all of the text messages were hearsay. Two, that they were unreliable, specifically the fabricated text message. And three, that we did make a 403 argument to the court, and that the court had the ability over the course of essentially two trials to look at the reliability of the text messages, and specifically the fabricated text message. Now I agree with you, you made that argument, and I think you make it quite clearly, if I'm right, that on page 446 of the transcript you say there could be a 403 argument. Yes, your honor. What I didn't see is the district court actually using the word confusion or rule 403 in response to that argument. It seemed to go back to reliability. So what's your best page site for where the district court conducted a rule 403 analysis? Your honor, I think it's going to be in that same area where we make the argument on page 446, and then the court goes back into looking at the messages. And on page 448, the court notes the text message were clearly hearsay, and there were not any sufficient guarantees of trustworthiness for its admissibility, and it was simply unreliable. And in coming to that conclusion, I believe he relied on everything that had previously happened, the record from the first trial, the arguments made, his ability to look at the text messages, and coming to that determination that there were no sufficient guarantees of trustworthiness. And so that's where his 403 analysis came to a head. But we have to do a little bit of inference there, because I don't, again, and I think agree with me, doesn't use the word confusing or rule 403 in making any of these rulings. We have to say the unreliability of the chamber's analysis, that all leads to rule 403? Yes, your honor, I believe that that's correct. And I think the court, in McCourt, specifically said this does not have to be, you know, the vocabulary words rule 403 or specific 403, you know, using those exact words. But in looking at the entire transcript, the record before the court, in determining that this court did conduct a 403 balancing analysis and found that, as Judge Loken was saying, there was going to be this other issue about the reliability of the text messages in front of the jury, which didn't need to happen. I would note that Mr. Cumby had the opportunity to still cross-examine Mr. Primo to assert his defense that it was Mr. Primo that did this in this case. And the jury clearly did a credibility determination between Mr. Primo and Mr. Cumby and convicted Mr. Cumby and believed Mr. Primo. I want to ask about authentication, because I am concerned, and I don't know that you made this argument, when I was reading this, I'm like, you can't just find a note outside the courtroom that says I did it, signed third party, and then, you know, impeach the witness with it. There needs to be some sort of authentication to it. A, did you make that argument? And B, am I right about that? I mean, I'm kind of figuring it out as I go along. I believe you are, Your Honor, and I do believe that, again, I didn't use the vocabulary word authentication, but I think we made that argument when we specifically said, you can't attribute this prior statement to Mr. Primo because there's no reliability to it because he didn't make the statement. So I think we did argue authentication in that respect without using that specific word. And again, that all couples back to the unreliability of this text message. And even the district court had the ability, just looking at the text message itself objectively, to determine that it wasn't reliable and that it shouldn't go in front of the jury. And then just looking at, you know, the factors that the court considered in determining that the message was unreliable, the context of it, the court could see the entire text exchange between Mr. Primo and Ms. Cumby. The fabricated text message was significantly longer. It didn't use any abbreviations, which had been used in the prior text messages. The timing of the fabricated text message in and of itself is concerning in the fact that it was sent five hours after the text message previously sent, and then there wasn't a response for approximately two months afterwards. So just looking at the timing of that text message, I would note that there was no response by Ms. Cumby after Mr. Primo allegedly sent this fabricated text message. Someone just confessed to the crime for which her husband is charged, and she doesn't even make a response about it. Also, the conduct in this case was very sophisticated. The way that Mr. Cumby was able to keep track of the individuals that he was extorting and soliciting child pornography from, and then the court was able to see Mr. Primo's demeanor, and he admitted that he was receiving disability for mental deficits. Again, all things that the court could take into consideration in determining that this fabricated text message was unreliable. The court also had the opportunity... Was this issue, I would think it was not central to the sentence-driving production crime. That already occurred before the extortion, didn't it? Your Honor, I think they overlapped, and I think... Well, yes, they overlapped, but you could take away all of the extortion facts. Well, I still think... And there's still sufficient evidence to convict him of production before he started extorting, right? Absolutely. My understanding of Mr. Golden's argument was that, and what I asked Mr. Cumby on the stand is, everything that's illegal that happened, you're saying that's Mr. Primo, and so he was saying yes. So he was contending that... But not the initial solicitations. I believe he argued, Mr. Cumby argued, that the initial solicitations of child pornography... Of the victims? Was Mr. Primo. Mr. Cumby attempted to put everything illegal... This doesn't have anything to do with that. If the court thinks that it went to whether or not Mr. Primo, one, tried to produce the child pornography, then I think it would go to this. If the court does not think that, then you're correct, that it doesn't go to that. It goes to the 24 months, not to the 180. Correct. Yes, Your Honor. And even if this court were to find that the district court should have let in the fabricated text message and should have allowed them to impeach Mr. Primo, it was harmless error because the evidence against Mr. Cumby in this case was so overwhelming. Mr. Cumby admitted to creating the Facebook page that was used to extort the victims and to produce the child pornography. The explanation that Mr. Cumby provided to the jury as to why he created that account was because he wanted to, quote, lurk on the mother of his child. But the evidence came out through the Facebook messages that he had never even once searched for the mother of his child on the Facebook page. So he never... Let me ask you this though, and this concerns me a little bit. Writing an opinion that says, if the confession is true and it's authenticated, that Mr. Primo actually sent this and confessed the crime, isn't it hard to write an opinion that's saying a third party confession is harmless? That the jury should not have heard... Assuming again that it's authenticated and that it doesn't run into any of the other problems we've talked about. Normally, I would agree with you. Absolutely. But in this case where there is zero indicia of reliability as to the text message, then no, I don't think that that would be a hard opinion to write. Right. So it ends up collapsing. And that's what I'm getting at. I don't think harmless there works because it ends up collapsing back into the reliability, the authenticity, and everything else. So we really have to deal with it either way. Yes, Your Honor. I believe that that's correct. Hi, counsel. Question on the text message. In looking at the transcript page, I'm on page 448 where the district judge is ruling and finding that the text message is unreliable. One of the things that seemed to weigh on this was the fact that this has come to the head possession of Primo's phone. And the court says that in past cases, she's been willing to do whatever she can to help him out. Do you know what the court was referring to there? I do, Your Honor. So at the time that Mr. Cumby committed the offenses that are before the court today, he was already on pretrial release in a felon in possession case. And so in that initial case, which was a case we first indicted him on, Ms. Cumby had initially, the night that Mr. Cumby was arrested, given a statement to law enforcement that she had observed Mr. Cumby point a firearm at the victim. We called her to the grand jury to ask her about her statement. And she testified in front of the grand jury that that was not true, that that statement had been coerced by the police. She also then talked about there was a third individual in the car with Ms. Cumby and Mr. Cumby on the night he was arrested for the firearm. She testified that she helped that other individual write an affidavit attempting to exonerate Mr. Cumby. Then in the second case, what I'll call the production of child pornography case, she testified that she helped another individual write an affidavit in an attempt to exonerate Mr. Cumby. So the court was considering those instances where Ms. Cumby had essentially solicited other individuals to write affidavits to exonerate her husband. Got it. Thank you. Thank you. Are there any more questions on the text message issue? I just didn't want to leave that. And to just briefly address the Batson issue, we did not strike any jurors on the basis of their race. We struck them for race neutral reasons. The purpose of jury selection is to get a fair and impartial jury. And what we did was strike jurors that we did not think could be fair and impartial. And the district court found based on all three of the reasons that we struck each of those three jurors, that they were race neutral and that they were non-discriminatory. And so looking again on a cold record, I think it's clear on a cold record that they were non-discriminatory, but the district court had the ability to see the jurors, to see non-verbal responses, to see and factor in their demeanor. And that's why great deference is given to the district court and their determination that we did not strike jurors based on racial, on their race. And so I thought it was important for us to say that's not why we did it. I think the record's clear why we struck those jurors and if the court has any specific questions. But again, I have a question about the one that was the reason for the strike was that she didn't raise her hand. Well your honor, that wasn't the sole reason for the strike. As we noted, she, on two different occasions, she didn't raise her hand and it wasn't until specifically prompted that she did. She also was the only juror who told us that the background and the upbringing of our victims would be an important issue to her, which we knew that issue was not going to come in because it's not relevant as to the victim's backgrounds. So it wasn't just her failure to engage in the process. And again, this court unfortunately through a cold record can't see her body language and her demeanor. But it wasn't just because she didn't raise her hand, it was because of her wanting to know more about our victims and their upbringing and our concern that if we didn't present that information to her, she may not have thought we did our job. And if there are no other questions, I would surrender the balance of my time. Thank you. Thank you. I'll give you a minute for rebuttal. I guess where I'm getting a bit confused with the impeachment issue on Primo is generally a person denies making a mistake and that's why you have to impeach them. So Mr. Primo does deny sending that text message. If I have an oral statement, if I have a witness who claims John Smith told me you know X and John Smith gets up there and testifies and says Y and he denies. I give him the opportunity to explain that and he denies saying Y. Then I bring in John Smith to say he's an issue. But I bring in the third party to say no, he did tell me that. And that's what we have here with Mr. Primo. And the crux of the issue really is the Buffalo case is an older case, but it's good law and the court did not make a 403. To me the key statement in Buffalo, which can be a little hard to follow the entire opinion, but toward the end we say the probative value of a Rule 613B prior inconsistent statement must be weighed against the prejudicial effect. Now if the court determines it has no probative value, that's the end of it. We don't have to run around and do a big 20 page 403 analysis. If the court made that finding, your honor, I would agree with that. My position is the court did not make that finding. The court ruled on hearsay. You say the word finding. I mean we don't microscope these things that way. Well maybe I'm just unfamiliar, your honor. If that's a fair reading of page 448 that Judge Shepard referred to, then we don't get to the need for an explicit 403 analysis. I agree with that based on Buffalo. There doesn't have to be a, you don't have to say here's what I've weighed, here's what I've done that. You don't have to use the word numbers 403. Sure, I agree with that, but it needs to be raised and addressed and the court needs to make that ruling. And I contend that the court did not make that ruling, your honor. My minute's over, Judge, unless you want to give me some more time or you have some more questions. No, sit down. Thank you, your honor. Argument's been helpful. Thank you, counsel. It's been an interesting case and we've run out maybe more than we should have or whatever. We'll see, but it helps.